**SO ORDERED.**

**SIGNED this 11 day of August, 2016.**



**David M. Warren**
**United States Bankruptcy Judge**

---

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF NORTH CAROLINA
## GREENVILLE DIVISION

IN RE:                                                         CASE NO. 15-06271-5-DMW

GUNBOAT INTERNATIONAL, LTD.
                                                                       CHAPTER 11
                 DEBTOR

### AMENDED MEMORANDUM OPINION ALLOWING
### ATTORNEYS' FEES AND EXPENSES

This matter comes before the court upon the Attorney's First Report and Application for

Approval of Compensation and Reimbursement of Expenses Pursuant to 11 U.S.C. § 503(b) of the

Bankruptcy Code ("Application") filed by Trawick H. Stubbs, Jr., Esq. ("Stubbs") of Stubbs &

Perdue, P.A. (collectively "Firm"), attorney for Gunboat International, Ltd. ("Debtor"), on March

29, 2016 and the Objection filed by the United States Bankruptcy Administrator ("BA") on April

22, 2016.  The court conducted a hearing on May 19, 2016 in Raleigh, North Carolina.  Stubbs and

Joseph Z. Frost, Esq. appeared on behalf of the Firm, C. Scott Kirk, Esq. appeared on behalf of the

BA, and Brian D. Darer, Esq. appeared on behalf of the Official Committee of Unsecured Creditors

("Committee").  Based upon the pleadings, court record, evidence presented, and arguments of

counsel, the court granted the Application, and on May 24, 2016, the court entered an Order

Allowing Attorneys' Fees and Expenses ("Order").  This Opinion sets forth the court's findings of fact and conclusions of law in support of the Order as follows:

## JURISDICTION

1.      This matter is a core proceeding pursuant to 28 U.S.C. § 157, and the court has jurisdiction pursuant to 28 U.S.C. §§ 151, 157, and 1334. *See In re Bernard Hill, Inc.*, 133 B.R. 61, 69 (Bankr. D. Md. 1991) (finding that "[t]he award of compensation to professional persons who render services to a bankruptcy estate is a 'core proceeding' arising under title 11 of the United States Code which bankruptcy judges may hear and determine").

2.      The court has the authority to hear this matter pursuant to the General Order of Reference entered August 3, 1984 by the United States District Court for the Eastern District of North Carolina.

## BACKGROUND

Nature of Debtor's Business and Events Leading to Chapter 11 Filing

3.      The Debtor's background was summarized in its Emergency Motion for Authorization to Use Cash Collateral filed on November 18, 2015, excerpted verbatim as follows:

a.      The Debtor is a corporation organized and existing under the laws of the State of Rhode Island.  The Debtor's principal place of business is in Wanchese, Dare County, North Carolina.   The Debtor designs and manufactures luxury performance cruising catamarans under the GUNBOAT brand.  The Debtor was founded and has been in business for over fifteen years, when shareholder Peter Johnstone ["Johnstone"] decided to redesign the sailboat, combining comfort and race boat technology, resulting in the first GUNBOAT model, the TRIBE in 2001, a catamaran built for both speed and long voyage ocean cruising.  Since the introduction of the TRIBE in 2001, the Debtor has expanded the

GUNBOAT brand to include the 40', 55', 65', 72', and 77' series, and has its first 78' series yacht in production.  In 2015, Cruising World named the Gunboat 55 the "Domestic Boat of the Year" in its 2015 Boat of the Year competition.  The Debtor's operations [employed] approximately 57 employees [involved] in the design, construction, and manufacture of the yachts and financial affairs of the Debtor.

b.      The Debtor began to experience financial problems as a result of cost overruns in the manufacture of its 55 foot series, with the costs for design and manufacture of the first yachts produced in this series exceeding the sale price for some of the yachts under construction.  While later yachts in the 55 foot series were profitable, the Debtor was unable to recoup sufficient proceeds from the later 55 foot yachts to offset the earlier 55 foot models.  This led to the termination of several contracts that were in various stages of production.  During this same time, the Debtor was forced to file a lawsuit against one of its boat manufacturers for defects in the manufacturing process and failure to honor the contractual warranty requirements.  This caused the Debtor to expend substantial funds making repairs and honoring these warranties.  The Debtor also had one yacht suffer damage during a test/photo shoot by a leading yacht magazine, resulting in negative publicity for the GUNBOAT brand.

4.      In mid-summer 2015, the Debtor consulted with the Firm for the purpose of structuring a workout of its financial crisis, including the possibility of filing a bankruptcy petition. The Firm spent several months analyzing and assessing the Debtor's situation, preparing for an anticipated Chapter 11 proceeding, and assisting with various contract disputes.

<u>Filing of Petition and Employment of the Firm</u>

5.     Through the Firm, the Debtor filed a voluntary petition ("Petition") for relief under Chapter 11 of the United States Bankruptcy Code ("Code") on November 18, 2015 and is operating as a debtor-in-possession pursuant to 11 U.S.C. § 1107.[1]

6.     On December 17, 2015, the Debtor filed an Application for Employment of Attorney ("Employment Application"), requesting the court to approve the Debtor's employment of the Firm as counsel pursuant to § 327(a).  In an affidavit attached to the Employment Application, the Firm disclosed that at the time the Debtor's Petition was filed, the Debtor owed the Firm $12,137.75 ("Pre-petition Debt") in fees and expenses associated with preparations for filing the Debtor's Chapter 11 proceeding and incurred between November 2, 2105 and November 18, 2015, the date the Petition was filed.  A detail of the Pre-petition Debt is as follows:

| | | |
|---|---|---|
| Attorneys' Fees ("Pre-petition Fees"): | | |
| Billed Fees | $ 27,216.00 | |
| Credit issued by the Firm ("Credit")[2] | (6,975.00) | |
| | | $ 20,241.00 |
| Expenses ("Pre-petition Expenses") | | |
| Chapter 11 Filing Fee | 1,717.00 | |
| Copying, Postage, etc. | 179.75 | |
| | | 1,896.75 |
| Total ("Pre-petition Charges") | | $ 22,137.75 |
| Less Pre-petition Payment | | (10,000.00) |
| Pre-petition Debt | | $ 12,137.75 |

7.     The BA objected to the Employment Application, asserting that the Firm was not disinterested as required by § 327(a).  The BA contended that the outstanding Pre-petition Debt made the Firm a creditor of the Debtor at the time of the Petition and, therefore, not disinterested as defined by § 101(14)(A).

---

[1] Further references to the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq.*, other than formal citations, shall be by section number only.

[2] The Firm did not provide the court with any explanation as to why it chose to issue the Credit or how the amount of the Credit was calculated.

8.      On January 27, 2016, the court entered an Order Allowing Employment of Attorney ("Employment Order").  In approving the Debtor's employment of the Firm, the court relied upon its previous determination that a debtor's attorney is disinterested under § 327(a) if a pre-petition debt owed by the debtor is "relatively modest, traceable temporally to a short period of time before filing, and confined to activities surrounding preparation of the petition and accompanying papers—the bare-bone, routine, and necessary services for filing." *In re Duffus & Associates, P.A.*, Case No. 05-03886-8-JRL (Bankr. E.D.N.C. Aug. 8, 2005).  The court directed that the Pre-petition Charges be included with the Debtor's first application for approval of attorneys' fees and expenses, at which time the BA would have an opportunity to object to any fees or expenses that do not specifically relate to the Debtor's Chapter 11 filing.

<u>Chapter 11 Proceeding</u>

9.      According to the Debtor's Schedules filed on November 30, 2015, at the time of the Petition, the Debtor owned assets valued at $1,141,168.36 and was liable for secured and unsecured debts totaling $15,574,422.16.

10.     Contemporaneous with the Petition, the Debtor filed an Emergency Motion for Authorization to Use Cash Collateral.  The court approved the Debtor's use of cash collateral on an interim basis subject to the Debtor making certain payments such as payroll, insurance, and rent for its business premises. [3]  The Debtor quickly had trouble meeting these obligations, and on December 23, 2015, the Debtor filed an Emergency Motion for Authorization to Enter Into and Obtain Post-Petition Secured Credit Transaction Pursuant to §§ 105(a), 363(b) and 364(c), pursuant to which the Debtor requested approval of a transaction ("DIP Financing Transaction")

---

[3] The court's approval initially came from the Interim Order Authorizing Debtor's Use of Cash Collateral Pursuant to 11 U.S.C. § 363 entered on November 20, 2015, with second and third interim orders respectively entered on December 17, 2015 and January 28, 2016.

with Johnstone.  Under the DIP Financing Transaction, Johnstone would extend credit to the Debtor up to $150,000.00, secured by a blanket lien on identified assets of the Debtor, to facilitate the Debtor's compliance with the interim orders authorizing its use of cash collateral.  On January 28, 2016, the court entered an Order Authorizing Post-Petition Financing which approved the DIP Financing Transaction.  Subsequently, on February 4, 2016, the court entered an Order Approving Budget that authorized the Debtor's continued use of cash collateral.

11.    The most significant event and accomplishment of the Debtor's Chapter 11 proceeding came as a result the Debtor's determination that a sale of its assets was in the best interest of the estate.  With the assistance of the Firm, the Debtor established an extensive but orderly bidding procedure for the sale of the assets.  On May 10, 2016, after several months of negotiations between the Debtor and affected parties, the court entered a Final Order Approving Sale of Property of the Estate Under Bankruptcy Code § 363 and the Assumption and Assignment of Executory Contracts and Leases Under Bankruptcy Code § 365 which, *inter alia*, approved a sale ("Asset Sale") of the bulk of the Debtor's assets pursuant to § 363.[4]

12.    In addition to obtaining approval of the DIP Financing Transaction and the immense undertaking of facilitating the Asset Sale for the benefit of the estate, the Firm assisted the Debtor with numerous other matters arising within the Chapter 11 proceeding including, but not limited to, obtaining orders authorizing payment of pre-petition wages and officer compensation; defending motions for relief from the automatic stay; assuming and rejecting certain unexpired leases and executory contracts; managing collateral litigation in which the

---

[4] Also on May 10, 2016, the court entered two additional orders respectively approving sales of certain assets that were excluded from the Asset Sale; however, the court recently set aside the Final Order Approving the Sale of Assets Free and Clear of All Liens, Claims, and Encumbrances to John Chen.

Debtor is a party; and complying with the monthly reporting and other requirements of Rule 4002-1 of the Local Rules of Practice and Procedure.

<u>Committee of Unsecured Creditors</u>

13.    On December 17, 2015, the court entered an Order Appointing Committee of Unsecured Creditors, which appointed named creditors holding unsecured claims to the Committee pursuant to § 1102.  On January 19, 2016, the court entered an Order Authorizing Payment and Retention of Parker Poe Adams & Bernstein LLP as Counsel for Official Committee of Unsecured Creditors which authorized the Committee to employ Parker Poe Adams & Bernstein LLP ("Parker Poe") as counsel pursuant to § 1103.

14.    The Committee, through Parker Poe, has been active in all phases of the Debtor's bankruptcy proceeding and has claimed it was significantly involved in negotiations leading up to the Asset Sale.  On April 6, 2016, Parker Poe filed an application for allowance of compensation in the amount of $63,552.00 and reimbursement of expenses in the amount of $1,866.31 incurred between December 11, 2015 and February 29, 2016.  On May 9, 2016, the court entered an order allowing payment to Parker Poe of the requested fees and expenses in the total amount of $65,418.31.

<u>Hudson Yacht Litigation</u>

15.    At the time of the Petition, the Debtor was a plaintiff in a civil action ("Hudson Yacht Action") against Hudson Yacht & Marine Systems, Inc. and Hudson Wang (collectively Hudson Yacht Defendants") pending in the United States District Court for the District of Rhode Island.  In the Hudson Yacht Action, the Debtor is seeking compensatory damages against the Hudson Yacht Defendants for breach of contract, fraudulent inducement, interference with

contractual relations, and unjust enrichment.  The Hudson Yacht Defendants deny liability to the Debtor and have asserted counterclaims against the Debtor for breach of contract and defamation.

16.    On January 13, 2016, upon motion of the Debtor, the United States District Court for the District of Rhode Island entered an Order transferring the Hudson Yacht Action to the United States District Court for Eastern District of North Carolina pursuant to 28 U.S.C. § 1404 "in the interest of justice" and "for the convenience of the parties."  On February 15, 2016, the United States District Court for the Eastern District of North Carolina entered an Order referring the Hudson Yacht Action to this court as being "related to" the Debtor's Chapter 11 proceeding pursuant to 28 U.S.C. § 157 and, therefore, subject to the General Order of Reference.  The Hudson Yacht Action is currently pending in this court as Adversary Proceeding No. 16-00015-5-DMW.

### Fee Application and Objection

17.    In the Application, the Firm requests allowance of attorneys' fees and expenses totaling $229,114.14.  This total includes the Pre-petition Charges of $22,137.75 which consists of the Pre-petition Fees of $20,241.00 and the Pre-petition Expenses of $1,896.75.  The balance of $206,976.39 ("Post-petition Charges") consists of $200,414.00 ("Post-petition Fees") in fees plus $6,562.39 ("Post-petition Expenses") in expenses incurred after the Petition.  Attached to the Application are two exhibits respectively containing invoices setting forth the Pre-petition Charges ("Pre-petition Invoices") and the Post-petition Charges ("Post-petition Invoices") (collectively referred to as "Invoices").

18.    The BA first objects to the Pre-petition Fees as being outside the scope of the holding in the *Duffus* case referenced in the Employment Order.  The BA asserts that the following services performed by the Firm are not sufficiently related to the preparation and filing of the Petition to prevent the Firm from being disinterested within the meaning of § 327:  preparation of

a leasehold deed of trust; responding to pending litigation; contract negotiations; and drafting of a note and security agreement.

19.     The BA also asserts that the Pre-petition Invoices contain "lumped time entries," thereby suggesting that the Pre-petition Invoices do not conform to the "Procedures for Preparing and Submitting Applications for Compensation by Professionals" contained within the BA's Chapter 11 Administrative Guide (as revised October 1, 2015).[5]  The BA contends that the lumped nature of the time entries prevent her from being able to accurately determine what amount of the Pre-petition Fees directly relates to the filing of the Petition; therefore, all of the Pre-petition Fees should be denied.

20.     In addressing the sizeable amount of Post-petition Fees, the BA acknowledges that the members of the Firm are experienced and talented bankruptcy professionals, and she does not object to their individual hourly rates which range from $95.00 to $135.00 for paralegals and $225.00 to $450.00 for attorneys.  Rather, the BA alleges that the Post-petition Fees are generally duplicative in nature and unreasonably excessive, especially when taking into account the fees allowed Parker Poe for representation of the Committee and awards made in similar cases. Specifically, the BA raises the following concerns about the Post-petition Fees:

　　　　a.     The Firm billed 63.10 hours, totaling $18,930.00 in fees, for time spent in connection with the transfer of the Hudson Yacht Litigation from Rhode Island to North Carolina;

---

[5] This manual provides that "[t]o the extent possible, separate time entries shall be made for each service – time entries should not be 'lumped' together.  The practice of lumping several different tasks together is discouraged as it often makes it difficult to separate compensable and non-compensable items."

b.      The Firm billed 34.40 hours in matters related to the Hudson Yacht Litigation, exclusive of the transfer in venue and which included $4,132.00 of fees incurred by two attorneys attending a preliminary mediation; and

c.      Stubbs billed 92.70 hours in post-petition fees, and it appears that 52.80 hours of this time are duplicative services rendered by other members of the Firm, particularly Laurie B. Biggs ("Biggs"), the apparent lead attorney in the Debtor's case. Stubbs billed 16.5 hours for attending court hearings where another member of the Firm was also present.

21.     At the Hearing, Biggs and Wendy Karam ("Karam"), a paralegal for the Firm, testified in support of the Application.  The Firm also introduced into evidence numerous exhibits which provide various breakdowns and analyses of the compensation sought in the Application. At the conclusion of the Hearing, the court granted the Application and orally summarized its findings of facts and conclusions of law in support of its decision and which are more fully set forth in this Opinion.

DISCUSSION

22.     As suggested by the title of the Application, the Firm makes its request for allowance of attorneys' fees and expenses pursuant to § 503(b).  This section allows an administrative expense for "compensation and reimbursement awarded under section 330(a) of this title." 11 U.S.C. § 503(b)(2).  Section 330(a)(1) provides as follows:

(1)     After notice to the parties in interest and the [Bankruptcy Administrator] and a hearing, and subject to sections 326, 328, and 329, the court may award to a trustee, a consumer privacy ombudsman appointed under section 332, an examiner, an ombudsman appointed under section 333, or a professional person employed under section 327 or 1103—

(A)     reasonable compensation for actual, necessary services rendered by the trustee, examiner, ombudsman, professional person, or

attorney and by any paraprofessional person employed by any such person; and

>        (B)     reimbursement for actual, necessary expenses.

11 U.S.C. § 330(a)(1).  The Application would have been more properly brought under § 330(a) in addition to § 503(b), because unless and until compensation and reimbursement are awarded under § 330(a), they cannot be allowed as administrative expenses.[6]

23.     The United States Court of Appeals for the Fourth Circuit ("Fourth Circuit") historically requires courts reviewing an application for compensation under § 330(a) to combine a "lodestar" analysis with detailed findings on the following twelve relevant factors (the "*Johnson* Factors") established by the United States Court of Appeals for the Fifth Circuit:

> (1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of the litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between the attorney and client; and (12) attorneys' fees awards in similar cases.

*Barber v. Kimbrell's, Inc.*, 577 F.2d 216, 226 n. 28 (4th Cir. 1978) *cert. den.*, 439 U.S. 934 (1978) (citing *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974)) (other citations omitted).  "[T]he Fourth Circuit appears to use a 'hybrid' of the [*Johnson*] factors and lodestar method." *In re Larson*, 346 B.R. 693, 701 (Bankr. E.D. Va. 2006) (citations omitted).  The *Johnson* Factors "should be considered in determining the reasonable rate and the reasonable hours, which

---

[6] Although the Application does not specifically reference § 330(a), the Firm recognizes the interplay of §§ 330 and 503(b) in its Memorandum of Law in Support of Attorney's First Report and Application for Approval of Compensation and Reimbursement of Expenses Pursuant to 11 U.S.C. § 503(b) of the Bankruptcy Code ("Memorandum") filed on May 18, 2016.  In the Memorandum, the Firm asserts that "the fees and expenses sought in the Application are reasonable and should be approved pursuant to 11 U.S.C. §§ 330, 331, and 503(b) of the Bankruptcy Code."  Section 331 simply authorizes the allowance of interim compensation during the pendency of a case.

are then multiplied to determine the lodestar figure which will normally reflect a reasonable fee."

*Equal Employment Opportunity Comm'n v. Service News Co.*, 898 F.2d 958, 965 (4th Cir. 1990)

(citing *Daly v. Hill*, 790 F.2d 1071 (4th Cir. 1986)).

24.    Subsequent to the Fourth Circuit's adoption of the *Johnson* Factors, the Bankruptcy

Reform Act of 1994 and the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005

amended § 330 to include a non-exhaustive list of factors that a bankruptcy court must consider in

determining reasonable compensation to be awarded a professional person:

> (3)    In determining the amount of reasonable compensation to be awarded to an examiner, trustee under chapter 11, or professional person, the court shall consider the nature, the extent, and the value of such services, taking into account *all relevant factors, including*—
>
> > (A)    the time spent on such services;
> >
> > (B)    the rates charged for such services;
> >
> > (C)    whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;
> >
> > (D)    whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;
> >
> > (E)    with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and
> >
> > (F)    whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

11 U.S.C. § 330(a)(3) (emphasis added).  This subsection instructs the court to take into account

all relevant factors; therefore, "in addition to [the *Johnson* Factors], any other factors enumerated

within Section 330(a)(3) of the Code that affect the reasonableness of hourly rates must also be

considered." *In re Brier Creek Corp. Center Assocs., Ltd. P'ship*, Case No. 12-01855-8-SWH,

2013 WL 2352570 at *3 (Bankr. E.D.N.C. May 29, 2013); *accord In re Shafer Bros. Constr. Inc.*, 525 B.R. 607, 615 (N.D.W. Va. 2105) (citation omitted) (holding that the court should "consider the *Johnson* factors in addition to those articulated in § 330(a)(3)").

25.    The Code does not define the term "reasonable" but "provides a description of services not considered reasonable and for which compensation 'shall not' be allowed . . . ." *In re RFS Ecusta Inc.*, Case No. 3:06 CV 386-MU, 2008 WL 506287 at *3 (W.D.N.C. Feb. 21, 2008). Section 330(a)(4) provides that compensation shall not be allowed for:

(i)    unnecessary duplication of services; or

(ii)    services that were not—

(I)    reasonably likely to benefit the debtor's estate; or

(II)    necessary to the administration of the case.

11 U.S.C. § 330(a)(4). "This statute does not require that the services result in a material benefit to the estate in order for the professional to be compensated; the applicant must demonstrate only that the services were 'reasonably likely' to benefit the estate *at the time the services were rendered*." *Pope v. Vu (In re Vu)*, 366 B.R. 511, 517 (D. Md. 2007) (quoting *Roberts, Sheridan & Kotel, P.C. v. Bergen Brunswig Drug Co. (In re Mednet, MPC Corp.)*, 251 B.R. 103, 108 (9th Cir. BAP 2000)) (emphasis added).

26.    The Application's inclusion of the Pre-petition Charges complicates the court's review under §330(a), because these charges relate to "services rendered to the debtor, as the debtor-in-possession does not come into existence until the petition is filed." *In re Four Star Terminals, Inc.*, 42 B.R. 419, 432 (Bankr. D. Alaska 1984). Section 330(a) does not expressly include awards for compensation and reimbursement incurred pre-petition; but this concept is

inherent, because a court's award under § 330(a) is *subject to* § 329.  Section 329 allows the court to review fees paid or agreed to by paid pre-petition by a debtor to an attorney and states as follows:

> (a)    Any attorney representing a debtor in a case under this title, or in connection with such a case, whether or not such attorney applies for compensation under this title, shall file with the court a statement of the compensation paid or agreed to be paid, if such payment or agreement was made after one year before the date of the filing of the petition, for services rendered or to be rendered *in contemplation of or in connection with the case* by such attorney, and the source of such compensation.
>
> (b)    If such compensation exceeds the reasonable value of any such services, the court may cancel any such agreement , or order the return of any such payment, to the extent excessive, to
>
> > (1)    the estate if the property transferred—
> >
> > (A)    would have been property of the estate; or
> >
> > (B)    was to be paid by or on behalf of the debtor under a plan under chapter 11, 12, or 13 of this title; or
> >
> > (2)    the entity that made such payment.

11 U.S.C. § 329 (emphasis added).  Considering §§ 329 and 330 in tandem, § 330(a) allows for consideration of compensation for services rendered pre-petition provided that such services meet § 329's requirement of being *in contemplation of or in connection with the case*.

27.    The standard for review under § 329 is limited to the *reasonableness* of an attorney's charges and does not include the more heightened standards of *actual and necessary* contained within § 330.  Under § 329 alone, reasonable attorneys' fees incurred pre-petition can only be allowed as a general unsecured claim against the estate; however, § 330(a) integrates fees that meet its increased standards of review and scrutiny.  The United States Court of Appeals for the Ninth Circuit explained that "[a] proper construction of the bankruptcy fee statute allows compensation under the administrative expense provision of section 330 for only those 'actual, necessary services' rendered by the debtor's attorney 'in contemplation of and in connection with'

14

the bankruptcy case." *Yermakov v. Fitzsimmons (In re Yermakov)*, 718 F.2d 1465, 1472 (9th Cir. 1983) (quoting 11 U.S.C. §§ 329(a), 330(a)(1)).

<u>Pre-petition Charges</u>

28.    Turning to the merits of the Application, the Pre-petition Charges must be reviewed in two stages.  First, as stated by the court in the Employment Order, any amounts owed by the Debtor to the Firm at the time of the Petition must be sufficiently related to the initiation of the Debtor's bankruptcy proceeding to satisfy the disinterestedness requirement of § 327.  To the extent that any of the Pre-petition Charges do not meet this threshold, then the Firm must waive those charges.  Pre-petition Charges that do sufficiently relate to the filing of the Petition and commencement of the case must then be reviewed under §§ 329 and 330 to be allowed as an administrative expense against the Debtor's estate.

29.    In the *Duffus* case referenced in the Employment Order, the debtor was an incorporated law firm that was winding down its practice after the death of its principal attorney. During this process, the debtor's counsel was essentially wearing two hats:  attorney for the debtor as well as attorney for the debtor's clients with matters pending at the time of the principal's death. In reviewing the pre-petition charges included within the debtor's counsel's application for approval of compensation and reimbursement of expenses, the court found that

> [m]any of the fees are tied to closing out the debtor's cases, arranging for the pick-up of office equipment and furniture, and other tasks associated with the winding down of the debtor.  While the court does not question the validity and quality of the work performed by counsel, seeking compensation for such pre-petition debt flies in the face of the disinterested requirement.  Such debt falls outside the limited scope of "activities surrounding preparation of the petition and accompanying papers."

*In re Duffus & Associates, P.A.*, Case No. 05-03886-8-JRL (Bankr. E.D.N.C. Nov. 30, 2005).

30.     The BA argues that the Pre-petition Fees being requested by the Firm fall outside the scope of the *Duffus* disinterestedness standard, because many of the time entries contained in the Pre-petition Invoices are not directly related to preparing the Petition and its accompanying motions for use of cash collateral and payment of pre-petition wages.  The court disagrees, and as noted at the Hearing, finds *Duffus* to be a start, not a boundary.  Initiating a bankruptcy proceeding, especially a complex Chapter 11 case, involves far more than physically preparing the initial forms and motions.  Attorneys representing an inevitable bankruptcy debtor are required to undertake many important tasks in the days and weeks preceding the filing.  Many of these tasks promote the efficient and successful administration of the case.  While *Duffus* correctly excludes compensation for the day-to-day and routine corporate counsel of a going concern, a bankruptcy attorney should not ignore tending to collateral matters that could negatively impact the eventual bankruptcy estate.

31.     Carrying *Duffus* to a logical conclusion, the pre-petition services must have a nexus to the bankruptcy filing.  Interpreting the nexus can be done on a spectrum of liberal to conservative.  If interpreted liberally, almost no unpaid pre-petition service that counsel performs for a potential debtor would prevent disinterestedness.  Contrarily, if interpreted conservatively, then only the unpaid fees for the most fundamental tasks relating to the preparation of the petition, schedules and statement of financial affairs can support a finding of disinterestedness.  The more appropriate method is the application of a logical and temporal nexus interpretation.  In order for counsel to be disinterested, the unpaid pre-petition services must have a logical relationship to the bankruptcy filing but must be done sufficiently close in time to the bankruptcy filing.  For example, advising a debtor on a reduction in employees six months from the petition date may have a logical nexus but not a temporal one.  Preparing an employee handbook for the debtor the month before the filing has a temporal nexus but not a logical one.  Preparing a consulting agreement for a

16

financial advisor three months prior to the filing has neither a logical nor a temporal nexus to the filing.

32.     In reviewing the Pre-petition Invoices, the BA and the court had concerns and questions about the following pre-petition services:

a.     Time entry dated November 3, 2015: "Preparation of Leasehold Deed of Trust."  This entry was not addressed by either Biggs or Karam, and the court believes it relates to a pre-petition sublease entered into between the Debtor and Warship, LLC, whereby the Debtor subleased its business premises in Wanchese, North Carolina.  The Pre-petition Invoices reflect that the fees related to this time entry are $148.50.

b.     Time entry dated November 4, 2015: "Review motion for summary judgment of Ihre Supply."  Biggs explained in her testimony that the Debtor was a defendant in an action initiated by Ihre Supply in Wilson County, North Carolina, and a motion for summary judgment against the Debtor was pending in the case.  The Firm reviewed Ihre Supply's motion for the purpose of ensuring that a pre-petition judgment was not entered against the Debtor, because such judgment would require the Firm to take costly post-petition action to avoid the judgment under applicable bankruptcy laws.  The total fees attributed to this time entry plus other lumped entries are $937.50.  The Firm's "Exhibit 8"[7] admitted into evidence at the Hearing suggests that the amount of these fees related to the questionable time entry are $468.75.

c.     Time entry dated November 9, 2015: "Review or, revisions to, and finalization of Answer and Defenses to Paxton Co. lawsuit and cover letter for same, and filing of the foregoing."  Biggs testified that the Debtor was also a defendant in an action

---

[7] Exhibit 8 is a copy of the Pre-petition Invoices with marginal notes presumably made by Biggs that appear to specify the amount of fees attributable to certain questionable time entries.

pending in Virginia, and for reasons similar to the action taken with respect to the Ihre Supply matter, the Firm filed an answer in this action to prevent a default judgment from being entered against the Debtor.  The Pre-petition Invoices reflect that the fees related to this time entry are $90.00.

d.      Time entry dated November 10, 2015:  "Review draft note and security agreement . . . ."  In the Objection, the BA speculated that this entry related to loan documents prepared to secure payment of administrative expenses incurred after the Petition.  Although this transaction that was ultimately disallowed by the court,[8] the documents were certainly prepared with the mindset of protecting the estate.  This entry is lumped with another matter for total fees of $360.00; however, Exhibit 8 attributes only $90.00 to the review of the draft note and security agreement.

e.      Time entry dated November 13, 2015:  "Review email from Lynn [sic] Dolan Re: Answer to counterclaim and preparation of email to Lynn [sic] Dolan Re: Same."  Biggs advised the court that Lynne Dolan ("Dolan") is an attorney licensed in Rhode Island who was representing the Debtor in the Hudson Yacht Litigation, and that the due date for an answer to counterclaims asserted against the Debtor dictated the date for filing the Petition.  This time entry is lumped with extensive other entries, including meetings with the Debtor's principal and reviews of the Petition and related matters.  The total fees for these lumped entries are $3,600.00; however, Exhibit 8 attributes only $75.00 to the communication with Dolan.

33.      Based upon its review of the Pre-petition Invoices in light of Biggs' testimony, the court concludes that all of the Pre-petition Fees appropriately fall within the logical and temporal

---

[8] Based upon concerns expressed by the court at hearing, the Debtor withdrew its request for allowance of the proposed administrative claims financing transaction.

nexus of activities related to the preparation for and filing of the Petition.  When the Debtor retained the Firm, the Debtor was litigating several contract disputes in different venues. Evaluating the posture of these actions was necessary to determine the appropriate financial strategy for the Debtor.  Once the decision was made to seek bankruptcy protection, the Firm prudently did not ignore issues and deadlines within these actions that could affect the Debtor's bankruptcy estate.  The court recognizes the Firm for its professionalism in defending the Debtor until the automatic stay imposed by § 362 was invoked by the Petition.

34.     Even if some of the Pre-petition Fees do not sufficiently relate to the Petition, the court notes that the total value of the fees for the disputed entries described above, even including lumped entries, is $5,136.00 which is less than the Credit of $6,975.00 given by the Firm pre-petition.

35.     Addressing the BA's objection to the lumped nature of the Pre-petition Invoices, the court agrees that time entries contained within the Pre-petition Invoices are not as succinctly categorized as the time entries in the Post-petition Invoices.  At the Hearing, the court contemplated requiring the Firm to separate the lumped entries to aid the court's review; however, after hearing Biggs' testimony, the court concluded that task was not necessary, especially taking into account the Credit.

36.     The BA did not object to the Pre-petition Expenses, the majority of which was the Chapter 11 filing fee in the amount of $1,717.00.  The remaining $179.75 resulted from copy expenses directly related to the preparation of the Petition and accompanying motions and schedules.

37.     The court holds that none of the outstanding Pre-petition Charges prevents the Firm from being disinterested under § 327; therefore, the Firm need not waive any of the Pre-petition

Charges.  The Firm points out that the issue of examining the scope of outstanding pre-petition fees can be avoided by simply filing an accelerated petition and leaving the tangential matters for addressing post-petition, but this rush of action is often not in the best interest of either the debtor or its creditors.  The court agrees; however, by finding that the Firm is disinterested, the court is not condoning bankruptcy attorneys routinely filing petitions prior to being paid for pre-petition services.  As previously stated by this court, "counsel in this District should rarely invoke the services in preparation and in anticipation of filing the petition doctrine to be qualified as disinterested.  The preferred practice in this District is for all pre-petition services prior to filing to be paid prior to the time of filing the Chapter 11 petition." *In re Premiere Enterprises of Whiteville, LLC*, Case No. 13-04639-8-RDD, 2013 WL 5907790 at *3 (Bankr. E.D.N.C. Nov. 4, 2013).  In other words, the final pre-petition invoice should be generated and paid prior to filing the voluntary petition.  Following this procedure would alleviate the uncertainly of fee and expense scrutiny by the BA, creditors, and this court.

38.    Having found the Firm disinterested, the court must now determine what amount of the Pre-petition Charges can be considered for allowance as an administrative expense.  As explained *supra*, pre-petition fees and expenses considered under § 330(a) are subject to § 329 and its limitation that the charges be in contemplation of or in connection with the case.  *See, e.g.*, *Four Star Terminals*, 42 B.R. at 432 (allowing a Chapter 11 debtor's counsel an administrative expense claim pursuant to §§ 329 and 330 for pre-petition fees related to background research regarding the debtor's financial condition; meetings with the debtor's representatives; and preparing the petition, statements, and schedules).  This requirement is coincidentally similar to the *Duffus* standard as expanded by this Opinion; therefore, for the reasons set forth in support of the Firm's

disinterestedness, the court also finds that all of the Pre-petition Charges are ripe for consideration

under § 330(a) along with the Post-petition Charges.

Lodestar and <em>Johnson</em> Factors Analysis

39.    "The bankruptcy court has a duty to examine all applications for attorney's fees.

This duty exists even in the absence of objections, and when objections are raised the court's

review is not limited to the items in controversy." *In re Watson Seafood & Poultry Co., Inc.*, 40

B.R. 436, 438 (Bankr. E.D.N.C. 1984) (citations omitted).  The court thoroughly examined the

Application and attached Invoices, with special attention given to the issues raised in the BA's

Objection.

40.    The court must now consider the Pre-petition Fees and the Post-petition Fees

(collectively "Fees") taking into account the *Johnson* Factors, which are easier to state than they

are to apply. *Id.*  The Fourth Circuit requires the court to

> first ascertain the nature and extent of the services supplied by the attorney from a
> statement showing the number of hours worked and an explanation of how these
> hours were spent.  The court should next determine the customary hourly rate of
> compensation.  These are essentially *Johnson* factors 1 and 5.  The court should
> then multiply the number of hours reasonably expended by the customary hourly
> rate to determine an initial amount for the fee award.  Finally, the court should
> adjust the fee on the basis of the other factors, briefly explaining how they affected
> the award.

*Id.* (quoting *Anderson v. Morris*, 658 F.2d 246, 249 (4th Cir. 1981)).

41.    The lodestar amount for the Fees is $220,655.00 which consists of the following:

| Hours | Hourly Rate | Fees |
|---|---|---|
| 5 | $      95.00 | $          475.00 |
| 216.5 | $    135.00 | $     29,227.50 |
| 4.7 | $    225.00 | $       1,057.50 |
| 63.4 | $    300.00 | $     19,020.00 |
| 3 | $    250.00 | $          750.00 |
| 12 | $    275.00 | $       3,300.00 |
| 34.4 | $    350.00 | $     12,040.00 |
| 297.2 | $    375.00 | $   111,450.00 |
| 111.8 | $    450.00 | $     50,310.00 |
| | | $   227,630.00 |
| Less Credit | | $      (6,975.00) |
| Total Fees | | $   220,655.00 |

Following the format set forth in *Watson Seafood & Poultry*, the court addresses each of the *Johnson* Factors as follows:

        a.     *The Time and Labor Expended*:  This first *Johnson* Factor is the heart of the BA's Objection to the Application and parallels § 330(a)(3)(A)'s mandate that the court consider the time spent on services.  The BA contends that the overall time spent on matters in this case is excessive and includes duplicative efforts by the various professionals employed by the Firm.  The court recognizes that the Firm invested a significant amount of time in this case, and there are several occasions when more than one attorney conducted research on a matter, participated in a conference, or attended a hearing.  At the time the Application was filed, the case was less than six months old.  During this short time period, the Firm encountered a plethora of issues, both routine and complex, and the court conducted hearings on approximately a dozen different dates, with several matters often scheduled together.  Biggs' testimony at the Hearing addressed the BA's specific concerns about the time and labor expended by the Firm as follows:

i.      The BA objected to entries contained within the Pre-petition Invoices that reflected both Stubbs and Biggs and sometimes Karam participating in conferences with officers of the Debtor. The BA specifically referenced over 24 hours being billed on November 13, 2015 in connection with a conference with Johnstone attended by Stubbs in person and Biggs and Karam via telephone. Biggs identified this conference as critical to obtaining necessary information about the Debtor's business, assets, and liabilities, and Biggs considered the participation of each professional essential. While Stubbs was more concerned with the overall operations of the Debtor's business and Chapter 11 procedural strategies, Biggs was gathering information needed for first day motions, and Karam was obtaining all the data needed for the Petition, schedules, and statements, which she was preparing in "real-time" during the meeting.

ii.      Biggs explained that in other instances when more than one attorney participated in a conference, it was often simply more efficient for each attorney to hear first-hand the vast and complex amount of information being discussed rather than for one attorney to participate and then subsequently attempt to convey adequately the information. Also, different attorneys handle different matters within the Debtor's case, and what information is most important to each attorney varies. Similarly, more than one attorney was often needed at hearings where the court was considering multiple issues either within a single matter or dispersed among several matters calendared together.

iii.      In addressing the time spent on the removal of the Hudson Yacht Action from Rhode Island to this court, Biggs admitted that there was a slight

23

duplication of legal research between two attorneys that in hindsight was probably not necessary, and Biggs attributed approximately $700.00 of fees related to this duplication. Biggs pointed out, however, that the two attorneys assigned to oversee the removal each have lower hourly rates than she.

      iv.     Also with respect to the Hudson Yacht Action, the BA suggested that it was excessive and premature for Biggs and another attorney to participate in a mediation, because the parties had not yet engaged in formal discovery. Biggs contended that this mediation was extremely productive and provided both her and the other attending attorney, a litigation specialist, with an opportunity to meet the Hudson Yacht Defendants face-to-face and determine the strengths and weaknesses of this case, which was previously handled by out-of-state counsel. While the mediation did result in an immediate settlement of the Hudson Yacht Action, Biggs nevertheless considered the time spent useful in that it helped them develop case strategies for going forward.[9]

      v.     Biggs acknowledged that she is the primary attorney responsible for the day-to-day oversight of the Debtor's case; however, she did not agree with the BA that she was the sole "lead attorney," making the time billed by Stubbs unnecessarily duplicative. Biggs contended that this case was far more than she could handle alone, and she relied on the continual assistance and guidance of the more-seasoned Stubbs. Biggs also pointed out that Stubbs was primarily

---

[9] On July 7, 2016, the parties to the Hudson Yacht Action filed a Consent Motion for Extension of Time to Answer Complaint which indicates that the parties have reached a settlement and are finalizing the details of that settlement.

24

responsible for several matters within the case such as the DIP Financing Transaction.

b.      *The Novelty and Difficulty of the Questions Raised*:  In this case, the Firm faced issues beyond what is generally encountered in the typical Chapter 11 proceeding. For example, the Debtor was a party to several lawsuits that involved questions of foreign and maritime law.  Also, the Asset Sale was not a straightforward private sale or public auction but involved extensive bidding procedures, including the use of a "stalking horse" bidder.

c.      *The Skill Required to Properly Perform the Legal Services Rendered*:  This case required the assistance of attorneys skilled in bankruptcy as well as other areas of law. Biggs and Stubbs adeptly counseled the Debtor on bankruptcy and related corporate matters but quickly utilized other members of the Firm when faced with issues beyond their specialty.  The Debtor certainly benefitted from its retention of a diverse practice firm as opposed to a solo bankruptcy practitioner, and the court suspects that employment and use of special counsel for the tangential matters would have resulted in the Debtor incurring even greater attorneys' fees than what are reflected in the Application.

d.      *The Attorney's Opportunity Costs in Pressing the Instant Litigation*:  There is no evidence before the court to suggest that the Firm lost other business as a result of its representation of the Debtor.

e.      *The Customary Fee for Like Work*:  The hourly rates charged by members of the Firm who participated in this case range from $95.00 to $135.00 for paralegals and $225.00 to $450.00 for attorneys.  These rates are customary for Chapter 11 services

approved by the court in this district, and the court finds them all to be reasonable, if not modest, given the complexity of the case and the success achieved by the Firm.

f.     *The Attorney's Expectations at the Outset of the Litigation*:  There is no evidence before the court to suggest what the Firm's expectations might have been in this case.

g.     *The Time Limitations Imposed by the Client or Circumstances*:  Bankruptcy matters, particularly Chapter 11 proceedings, involve more deadlines than general litigation matters in state or federal courts.  The Firm adhered to timelines within the case and quickly obtained the necessary orders early in the case to allow for the Debtor's continued operations.  Karam testified that the bidding procedures for the Asset Sale involved numerous deadlines, and that she spent considerable time working with the Clerk's office to make sure that related controversies were timely presented to and heard by the court so that the Asset Sale would not be hindered or delayed.

h.     *The Amount of Controversy and the Results Obtained*:  The respective values of the Debtor's assets and liabilities at the time of the Petition were substantial, reflecting a debt to assets ratio of over 1,300 percent.  The court commends the Debtor and the Firm, in conjunction with assumed efforts by the Committee and the BA, for quickly realizing that an orderly sale of its assets was in the best interest of the estate.  Although this case has essentially become a liquidating Chapter 11, the court is convinced that the Asset Sale combined with the pending resolution of other matters will ultimately result in a higher distribution to creditors than under a Chapter 7 liquidation.  Under Chapter 7, it is unlikely that the majority of assets would be similarly be sold as a "single lot" with potential purchasers having the option to assume liabilities, executory contracts, or leases

of the Debtor. Biggs testified that the success of this case would not have been possible without the approved DIP Financing Transaction, which enabled the Debtor to continue operating during the pendency of the Asset Sale, thereby preserving the assets' value. Although the Application was filed prior to the approval of the Asset Sale, many of the fees associated with obtaining and expediting this approval are reflected in the Application.

       i.     *The Experience, Reputation and Ability of the Attorney*: The Firm is well-recognized as one of the premiere and leading bankruptcy firms in this district, with its bankruptcy practice established over forty years ago, preceding the creation of bankruptcy courts by The Bankruptcy Reform Act of 1978. As directed by § 330(a)(4)(E), the court notes that both Biggs and Stubbs are certified as bankruptcy specialists by the North Carolina State Bar Board of Legal Specialization. The Firm's practice areas extend beyond bankruptcy and include business law, civil and criminal litigation, estate planning and administration, family law, and real estate law. This wide range of expertise, particularly in the business law and litigation arenas, proved valuable to the Firm's representation of the Debtor.

       j.     *The Undesirability of the Case within the Legal Community in which the Suit Arose*: There is no evidence before the court to suggest that this case is considered undesirable amongst bankruptcy practitioners in this district.

       k.     *The Nature and Length of the Professional Relationship between the Attorney and Client*: The Firm was retained by the Debtor approximately four months prior to filing the Petition for the purpose of structuring a financial rehabilitation and had not previously represented the Debtor in litigation or corporate governance matters.

l.      *Attorneys' Fees Awards in Similar Cases*:  The BA compares the Debtor's case to a previous Chapter 11 proceeding in this district, *DRI Corporation*, Case Number 12-02298-8-SWH.  The *DRI Corporation* case also involved a committee of unsecured creditors, debtor-in-possession financing, and a § 363 sale that utilized a "stalking horse" bidder.  The total fees and costs awarded to that debtor's counsel over an approximate two and one-half year period was $302,547.29, and that case resulted in payment in full of all creditor claims, with some distribution to equity holders.  The BA suggests that the Debtor's case may be administratively insolvent with little or no distribution to unsecured creditors; therefore, the total amount of $229,114.14 requested in the Application is unreasonable.  The court agrees with Biggs that comparing the *amounts* of attorneys' fees and expenses incurred in similar cases is not particularly useful, because each case will involve different issues and tasks performed by different professionals with different hourly rates.  What is perhaps a more appropriate comparison is whether the respective attorneys billed in the same manner, such as the formula used for billing travel time or what tasks are assigned to paralegals.  When comparing the Debtor's case to *DRI Corporation*, Biggs pointed out that the overall approach to representation and billing are similar, and *DRI Corporation*'s attorney's invoices also reflect instances of representation by more than one attorney at conferences or hearings.

42.      The court acknowledges that there is some duplication of representation among members of the Firm; however, the court is satisfied with Biggs' explanations regarding the frequent need for involvement of more than one professional.  Section 330(a)(4)(A)(i) prohibits allowance of compensation only for *unnecessary* duplication of services, and most duplicative efforts in this case were probably necessary for its effective administration and successful

outcome.  The court agrees with the United States Bankruptcy Court for the Middle District of Tennessee that "[n]o *per se* rule of allowance or disallowance of fees for intra-office conferences or multiple appearances at a hearing is required by the Code.  The flexible standard of '. . . reasonable compensation for actual, necessary services . . .' applies and case-by-case, if not item-by-item analysis is appropriate." *In re Aztec Co.*, 113 B.R. 414, 415-416 (Bankr. M.D. Tenn. 1990) (quoting 11 U.S.C. § 330(a)).

43.     The court is also persuaded by case law recognizing that some Chapter 11 proceedings require the involvement of multiple attorneys.  For instance, the United States Bankruptcy Court for the Eastern District of Michigan opined that "there are times when law firms can justify billing a debtor for the services of two or three attorneys at an intra-office conference— at the beginning of a case to assign work, or at a critical juncture in the case to define duties, or to delegate jobs and then to have people perform those jobs, or to discuss the status of various matters in a large and complicated bankruptcy." *In re New Boston Coke Corp.*, 299 B.R. 432, 445 (E.D. Mich. 2003).

44.     In *In re Kennedy Mfg.*, 331 B.R. 744, 750 (Bankr. N.D. Ohio 2005), the United States Bankruptcy Court for the North District of Ohio found that the United States Trustee's concerns of "overstaffing" were tempered by two overall considerations:  the complexity of the case and the successful outcome.  The *Kennedy Mfg.* court elaborated:

> First, and while not needing to delve into all the specifics, the Court is very cognizant that Counsel for the Debtors put a lot of work into this case.  And although not a prerequisite, the end result in this case also cannot be ignored:  a confirmed plan of reorganization was entered by this Court permitting the Debtors to continue with its operations. *In re Unitcast, Inc.*, 214 B.R. 992, 1008-09 (Bankr. N.D. Ohio 1997) (the results obtained is a major factor in the allowance of fees), *aff'd*, 219 B.R. 741 (6th Cir. BAP 1998).  The Court is also aware that this case involved areas that required the expertise of nonbankruptcy counsel—e.g., issues involving the Debtors' pension plan—and in this way, the law firm of Taft, Stettinius & Hollister, having attorneys on its staff with specialized areas of

expertise, was able to offer such services at reasonable, and potentially lower costs than had the Debtors been forced to seek such services on a piecemeal basis.

*Kennedy Mfg.*, 331 B.R. at 750.  Likewise in the case *sub judice*, the court is swayed by the results obtained in this case as a result of the various expertise contributed by the members of the Firm.

45.    Staffing a larger and more complex Chapter 11 case requires almost expert managerial skills.  Both the case and the personnel assigned to it must be properly managed.  The luxury of having several attorneys and staff in a firm representing a debtor is tempered by the duty to delegate the responsibilities of those persons to the tasks.  The talents and skill levels of the professionals and para-professionals must be allocated to achieve the maximum result at the minimal cost.  This exercise is more art than science, and care must be given at every step in the process to achieve the expected result.  The Firm does not stray far from this difficult goal.

46.    The court will finally address the BA's suggestion that the Fees are excessive when compared to the compensation allowed Parker Poe for its representation of the Committee during the same time period.  Nothing in the Code or the *Johnson* Factors requires the court to consider awards made to other professionals within the same case.  The court can only speculate that the Committee's involvement has benefitted the Debtor's estate; however, the Committee's assumed contribution should not affect what would otherwise be allowable compensation under § 330(a).

47.    The court thoroughly examined the Invoices and finds them, particularly the Post-petition Invoices, to be extremely detailed and telling of exactly what was done and accomplished in the case.  The court finds all of the Fees to reflect reasonable compensation for actual and necessary services of the Firm.  The court understands and appreciates the BA's concern over the large amount of the Fees; however, in light of the successful Asset Sale and resolutions of other matters in the case, the court believes that any attempt to reduce the Firm's hours under the first *Johnson* Factor would be arbitrary at best.  Even if the court did choose to reduce the allowable

hours, it could also choose to offset this by an increase of the Firm's hourly rates. *See Watson Seafood & Poultry*, 40 B.R. at 445 (noting that "[t]he court may adjust the hourly rate to reward exceptional efforts and benefits"). Rather than engage in a nitpicking effort that would not produce a significantly different end result, the court chooses to allow all of the Fees.

48. The court noted *supra* that the Pre-petition Expenses were directly related to the preparation and filing of the Petition, the majority of the Pre-petition Expenses being the Chapter 11 filing fee. As with the Pre-petition Expenses, the BA likewise did not object to the Post-petition Expenses. The court reviewed all of the Pre-petition Expenses and Post-petition Expenses (collectively "Expenses") and finds them all to be actual and necessary expenses incurred in connection with this case; therefore, the court allows all of the Expenses.

CONCLUSION

49. For the reasons set forth in this Opinion, the court confirms that the Application is granted as provided in the Order entered on May 24, 2016. Pursuant to §§ 329, 330(a), and 503(b), the Firm is allowed an administrative expense compensation in the amount of $220,655.00 and reimbursement of expenses in the amount of $8,459.14 for the period from November 2, 2015 through March 25, 2016 for a total of $229,114.14, of which the sum of $10,000.00 has been paid previously. In reaching this conclusion, the court considered all of the evidence, exhibits, testimony, and arguments of counsel, regardless of whether or not they are specifically mentioned in this Opinion.

**END OF DOCUMENT**