**SO ORDERED.**

**SIGNED this 6 day of September, 2016.**

David M. Warren
United States Bankruptcy Judge

_____

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF NORTH CAROLINA
### GREENVILLE DIVISION

IN RE:                                           CASE NO. 15-06271-5-DMW

GUNBOAT INTERNATIONAL, LTD.

                                                 CHAPTER 11

DEBTOR

**ORDER SETTING ASIDE FINAL ORDER APPROVING THE SALE OF ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, AND ENCUMBRANCES TO JOHN CHEN ENTERED MAY 10, 2016**

This matter comes on to be heard upon the Motion for Reconsideration of Sale Order and for Additional Relief ("Motion to Reconsider") filed by Holland Composites B.V. ("Holland") and PeeJeeDee Sailing B.V. ("PeeJeeDee") (collectively "Holland Companies") on May 23, 2016 and the Joint Response to Motion for Reconsideration of Sale Order and for Additional Relief ("Response") filed by Gunboat International, Ltd. ("Debtor") and the Official Committee of Unsecured Creditors ("Committee") on June 9, 2016.  The court conducted a hearing in Raleigh, North Carolina on July 28, 2016.  John C. Bircher III, Esq. ("Mr. Bircher") appeared for the Holland Companies, Laurie B. Biggs, Esq. ("Ms. Biggs") appeared for the Debtor and Brian D. Darer, Esq. ("Mr. Darer") appeared for the Committee.  Thijs van Riemsdijk ("Mr. Van Riemsdijk"), Managing Partner of Holland and Authorized Agent of PeeJeeDee, provided

testimony on behalf of the Holland Companies.  Based upon the evidence presented and the arguments of counsel, the court makes the following findings of fact and conclusions of law:

BACKGROUND

1.    The Debtor describes itself as being in the business of designing and manufacturing luxury performance cruising catamarans under the "Gunboat" brand.  The Gunboat G4 ("G4") is a boat model that was created to be included in the Debtor's product line.

2.    On September 24, 2013, the Debtor and PeeJeeDee executed a Gunboat 'G4' (40') Design & Copyright Agreement ("G4 Design Agreement"), whereby the parties agreed "to jointly design a series produced 40' long high performance . . . catamaran sailboat . . . for [the Debtor] to sell and manufacture."  Under the terms of the G4 Design Agreement, the Debtor and PeeJeeDee jointly hold all copyrights associated with the designs created pursuant to the G4 Design Agreement.  The G4 Design Agreement requires the Debtor to pay to PeeJeeDee €75,000.00 as a design fee for the first G4 built from PeeJeeDee's design and $5,000.00 for each subsequent G4 built.

3.    On October 3, 2013,[1] the Debtor entered into a Licensee Agreement to Manufacture ("Licensing Agreement") with Holland, whereby the Debtor granted to Holland a license and exclusive right to use "certain designs and technical and design information" to manufacture the G4.

4.    Section 4.1 of the Licensing Agreement contemplated that Holland would produce the tooling (including "all molds, jigs and patterns") required to build the G4, and the Debtor would reimburse Holland according to the following payment schedule:[2]

---

[1] The date on this Agreement is illegible on the copy of the Agreement presented to the court; however, the Settlement Agreement, discussed *infra*, states that the Agreement was dated October 3, 2013.

[2] The Holland Companies assert in the Motion to Reconsider that the Debtor has failed to reimburse Holland as required by the Licensing Agreement and, as a result, has forfeited its ownership interest in assets it shared jointly

4.1.1.1.1   15% of the tooling cost[3] upon commencement of producing the tooling;

4.1.1.1.2   15% of the tooling cost upon completion of the hull, deck and pilothouse tooling; and

4.1.1.1.3   The remaining 70% of the tooling cost to be paid in equal payments upon delivery of the first ten hulls to the Debtor.

5.      The Licensing Agreement has an initial three-year term through October 2, 2016. Section 8.2 of the Licensing Agreement states that the three-year term shall automatically renew, but either party may give written notice of its intent to terminate the Licensing Agreement at least 180 days before the three-year term expires, "in which event [the Licensing Agreement] shall terminate at the end of the then current period." Upon termination, Section 10.6 of the Licensing Agreement requires Holland to turn over all tooling to the Debtor, subject to the requirement that the Debtor pay Holland the balance owed for tooling (as contemplated by Section 4.1) "at time of Formal Acceptance by the boat purchaser."[4]

6.      Two G4 boats have been built to date. Both took longer to manufacture than the parties expected.

7.      The Debtor filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code on November 18, 2015 ("Petition Date") and began operating as a debtor in possession pursuant to 11 U.S.C. § 1107. The Debtor filed its Schedules of assets and liabilities on November 30, 2015. On Exhibit B to Schedule B, the Debtor listed "G4 Sail Plan Engineering," "G4 Tooling payement [sic] Hull 1 and 2," and "G4 Design fees" as personal property assets belonging to the Debtor. The Debtor listed PeeJeeDee as an unsecured creditor with a $14,250.00

---

with Holland under the Licensing Agreement. A determination regarding ownership of the assets shared by the Debtor and Holland pursuant to the Licensing Agreement, while seemingly an essential prerequisite to the sale of the Debtor's interest (if any) in those assets, has not been made by the parties and is not before the court at this time.

[3] The tooling cost was capped at the lesser of €450,000.00 or the actual cost of producing the tooling.

[4] This modification of the payment schedule contained in Section 4.1.1, only applicable in the event Holland terminates the Licensing Agreement, appears to amend the timing of repayment as originally governed by Section 4.1.1.3. The court includes this language simply to acknowledge that upon Holland's termination of the Licensing Agreement, the Debtor remains obligated to reimburse Holland for tooling costs.

claim on Schedule F but did not list Holland as a creditor.  The Debtor listed Holland and PeeJeeDee as a parties to contracts "for design work" on Schedule G.

8.     Prior to the Petition Date, the Debtor expressed concern to the Holland Companies that the G4 did not align well with the Debtor's other boat models.  In January of 2016, Peter Johnstone ("Mr. Johnstone"), President of the Debtor at that time, and Mr. Van Riemsdijk began negotiating an agreement that would result in the G4 being removed from the Debtor's product line, with the Holland Companies taking over all aspects of the design and manufacture of the G4 and acquiring all intellectual property rights to the G4 design.

9.     Before Mr. Johnstone and Mr. Van Riemsdijk reached any agreement, Mr. Johnstone was removed from his position as President of the Debtor and replaced by Barry Carroll ("Mr. Carroll").  Mr. Van Riemsdijk and Mr. Carroll began negotiating a severance of the relationship between the Debtor and the Holland Companies, and on January 28, 2016, Mr. Van Riemsdijk sent a draft of a settlement agreement to the Debtor.

10.     On January 19, 2016, during the early stages of settlement negotiations between the Debtor and Mr. Van Riemsdijk, the Debtor filed an Amended Expedited Motion for Entry of Order (I) Authorizing Sale of Debtor's Assets Pursuant to § 363 Free and Clear of All Liens; (II) Approving Procedures for the Sale of the Debtor's Assets; (III) Approving Procedures for the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Pursuant to § 365; (IV) Approving Payment of Confidential Maximum Stalking Horse Fee; and (V) Scheduling of Hearing for Final Approval of Sale of Assets ("Sale Motion").  The Sale Motion proposed bidding procedures that allowed "potential purchasers [to] make offers for the Debtor's assets as a 'single lot' or some lesser amount of its assets, and [to] elect to assume certain liabilities,

executory contracts, or leases of the Debtor." The Holland Companies do not dispute that they received notice of the Sale Motion.

11.     The Sale Motion stated the following:

> the Debtor is the holder of various executory contracts, leases, and other intellectual property rights which it believes are extremely valuable to potential purchasers. The Debtor believes that establishing a process whereby the known cure amount on any contracts and leases is determined in advance of the Bid Deadline will help the Debtor [in evaluating bids].

The Sale Motion proposed that the Debtor would do the following:

> file and serve on all known counterparties a Schedule of Executory Contracts and Unexpired Leases . . . *that may potentially be assumed and assigned to the ultimate purchaser of the assets*, including the proposed cure amount required pursuant to section 365 of the Bankruptcy Code for the assumption and assignment of such contracts, if any.

(emphasis added).

12.     On February 2, 2016, the Debtor filed an Application to Employ The Finley Group, Inc. ("Finley") and Matthew W. Smith ("Mr. Smith"), Managing Director of Finley, as "broker/sale facilitator" for the sale of the Debtor's assets. That Application was allowed by Order entered March 25, 2016. Mr. Smith's role included identifying and qualifying potential purchasers of the Debtor's assets.

13.     On February 16, 2016, the Debtor filed a Schedule of Executory Contracts and Unexpired Leases and Notice of Cure Amounts ("Executory Contract Schedule") pursuant to the procedure proposed in the Sale Motion. Neither the G4 Design Agreement nor the Licensing Agreement was listed on the Executory Contract Schedule.

14.     On February 23, 2016, the court entered a Consent Order ("Sale Procedure Order") allowing the Debtor to sell its assets using the procedure proposed in the Sale Motion, subject to certain provisions as negotiated by the Debtor and parties in interest that had objected to the Sale

Motion.  The Sale Procedure Order set April 8, 2016 as the deadline to submit bids for the Debtor's assets.

15.     The deadline for non-governmental unit creditors to file a proof of claim expired March 21, 2016.  Neither of the Holland Companies filed a proof of claim in this case.

16.     On April 1, 2016, Mr. Smith emailed to Mr. Van Riemsdijk a proposed settlement agreement ("Settlement Agreement") for Mr. Van Riemsdijk to review and sign.  In that same email, Mr. Smith stated that "there is a deadline of Monday, April 4 to provide a six month [sic] termination notice [of the Licensing Agreement].  In an abundance of caution, we [the Debtor] plan to make that notice with the understanding that once the court approves this settlement agreement the termination notice would be void anyway."

17.     On April 4, 2016, Mr. Van Riemsdijk sent to Mr. Smith a copy of the Settlement Agreement executed by the Holland Companies.  Under the Settlement Agreement, the Holland Companies agreed to waive their asserted[5] claim of €515,700.00 against the Debtor.  Holland agreed to pay the amount of €20,000.00 on the effective date of the Agreement, plus a royalty fee of €20,000.00 to the Debtor for each G4 sold during the seven years following execution of the Settlement Agreement.  The royalty obligation to the Debtor would not be secured by any of the Holland Companies' assets.

18.     In his email to Mr. Smith on April 4, 2016, Mr. Van Riemsdijk stated that he would "email the termination notice in a separate message, *obviously with the intention of it to be void after court approval of the attached settlement agreement*" (emphasis added).  Mr. Carroll and Debtor's counsel were both copied on Mr. Van Riemsdijk's email to Mr. Smith.

---

[5] This claim was asserted in negotiations between the parties, not in the form of a claim filed in the Debtor's case.  Mr. Van Riemsdijk testified that the €515,700.00 figure included PeeJeeDee's claim of $14,250.00 listed on the Debtor's Schedule F.

19.     Mr. Van Riemsdijk subsequently emailed Mr. Carroll on April 4, 2016 to state "[d]ue to the 180 day [sic] notice period for the licence [sic] agreement we cannot await court approval of the agreement as discussed with [Mr. Smith].  Please find our termination notice attached."  The attached termination notice ("Termination Notice") stated "[w]e have reached a consensus on a settlement agreement, although that agreement does not have court approval as yet.  This termination notice is therefore a caution measure *in the event the settlement agreement should not be approved by the court*" (emphasis added).  The Termination Notice also contemplated that if the Settlement Agreement was not approved by the court (and the conditional notice was thus deemed effective to prevent an automatic renewal of the Licensing Agreement term), then the Debtor would owe €503,700.00 to Holland, due by October 3, 2016,[6] the expiration date of the Licensing Agreement and the effective date of the contemplated termination.

20.     Mr. Smith sent an email on April 7, 2016 to parties in interest of the sale of the Debtor's assets, including Mr. Van Riemsdijk, notifying them that the Debtor had extended the bid deadline from April 8, 2016 to April 15, 2016.  On April 11, 2016, the Debtor filed a Notice of Designation of Stalking Horse that established a minimum bid to trigger a competitive sale for assets of the Debtor unrelated to the G4 product line.  The Notice made clear that "[b]ids for assets not purchased by the Stalking Horse Bidder do not need to exceed" the minimum bid.

21.     On April 13, 2016, in response to an inquiry from Mr. Van Riemsdijk about the progress of the Settlement Agreement, counsel for the Debtor sent an email to Mr. Van Riemsdijk, with Mr. Smith copied, that stated "[t]he motion [to approve the Settlement Agreement] is being filed with the Bankruptcy Court today."  No such motion was ever filed with the court.  Counsel for the Debtor sent a second email to Mr. Van Riemsdijk that same day that outlined the procedure

---

[6] This date is the one Mr. Van Riemsdijk used in the Termination Notice.  By the court's calculations, the current three year term of the Licensing Agreement dated October 3, 2013 will expire on October 2, 2016.

required for a motion seeking approval of a settlement.  Counsel stated that a motion seeking approval of a settlement "has a required notice period of 24 days" and informed Mr. Van Riemsdijk that

> [i]f no one files a written objection with the Bankruptcy Court during [the required notice period], the Bankruptcy Court will approve the terms without a hearing.  If someone does file a written objection, [the court] will schedule it for a hearing . . . . If there is a hearing, the only likely reason the Bankruptcy Court would not approve the agreement is if someone else were willing to pay a higher price for whatever interest [the Debtor] may have in [the G4 Design Agreement and Licensing Agreement] and the [intellectual property related to the G4 Design Agreement].

22.     On April 26, 2016, the court held a hearing on the Sale Motion pursuant to the Sale Procedure Order.  Debtor's counsel and Mr. Smith spent the majority of that hearing describing an auction conducted by the Debtor for the sale of the majority of its assets to the highest bidder, GL Yachting USA, Inc. ("GL Yachting").  Toward the end of the hearing, Ms. Biggs, the Debtor's counsel, stated that the Debtor had agreed to sell assets that "relate to the G4 line," specifically "tooling . . . the right to that brand, the intellectual property associated with that brand" to John Chen ("Mr. Chen") for $108,000.00.  Ms. Biggs stated that the Debtor "didn't have any other qualified bidders" for those assets.  She further stated that "there is a contract with Holland . . . that is part of [Mr. Chen's] purchase agreement, and we are working through a couple of issues about the terms of that contract."  Upon inquiry by the court, Mr. Smith then voiced his approval of Mr. Chen as a purchaser and stated that Mr. Chen "is buying . . . Gunboat's interest in the G4 . . . the intellectual property and the rights, and Gunboat's rights are shared with the [Holland Companies] so Mr. Chen recognizes that he's not buying all of it, but he's buying Gunboat's interest in that."

23.     At the time of the hearing on the Sale Motion, the court was unaware that the G4 Design Agreement and the Licensing Agreement had not been included on the Executory Contract

8

Schedule.  Neither Ms. Biggs nor Mr. Smith mentioned any liabilities owed by the Debtor to the

Holland Companies that Mr. Chen would be assuming through his purchase of the Debtor's interest

in the G4 assets.  The court was also unaware of the existence of the Settlement Agreement and

the fact that the Holland Companies had attempted to "purchase" the Debtor's interest in the G4

assets pursuant to the Settlement Agreement.  The court orally approved the sale of the G4 assets

to Mr. Chen, pending a final review of the agreement between the Debtor and Mr. Chen.

   24. On May 4, 2016, Mr. Smith emailed Mr. Van Riemsdijk to inform him that

> prior to the Bid Deadline, the Debtor received a separate offer for Gunboat's
> interest in the G4 assets (Intellectual Property, Etc.). The bidder understands that
> Gunboat has a shared interest with [the Holland Companies]. Because their [sic]
> bid included a higher cash consideration at closing, the Debtor and the Unsecured
> Creditor's Committee have agreed to sell the assets in lieu of asking the Court to
> approve the Settlement Agreement.

Mr. Smith acknowledged that this news would be "disappointing" and "a surprise" but stated that

"the US Bankruptcy process requires the Debtor to achieve the highest and best offer for the assets

of the Bankruptcy Estate" and "[i]t was determined that the offer to buy the assets was a better

recovery for the Estate and provided more certainty than the terms of the proposed [Settlement

Agreement]."  The Holland Companies assert they were unaware that any party had bid on the

Debtor's interest in the G4 product line prior to receiving Mr. Smith's email on May 4, 2016.  Mr.

Van Riemsdijk did not reply to Mr. Smith's email or otherwise contact Mr. Smith, Mr. Carroll or

Ms. Biggs after being notified that Mr. Chen had purchased the assets.

   25. On May 10, 2016, the court entered a Final Order Approving the Sale of Assets

Free and Clear of All Liens, Claims, and Encumbrances to John Chen ("Chen Sale Order") as

submitted by the Debtor[7] for entry by the court.  The Chen Sale Order approved Mr. Chen's purchase of the following:

> assets more commonly known as the Gunboat G4 brand including, but not limited to the tooling, intellectual property (excluding the trademark "Gunboat"), and branding related to the G4 assets, to include all Property defined to be the Tangible Personal Property and the Intangible Personal Property pursuant to the Agreement, (collectively the "G4 Property").

26.     The referenced Agreement ("Chen Sale Agreement") was attached to the Chen Sale Order.  The Chen Sale Agreement made no reference to the Licensing Agreement but did include the G4 Design Agreement in its lists of tangible and intangible assets[8] to be sold to Mr. Chen.  It purported to "sell, convey and assign" to Mr. Chen "[a]ll of [the Debtor's] intangible personal property . . . including: 'the designs and intellectual property exclusively related to the Gunboat [G4] . . . .'"  The Chen Sale Agreement also identified the G4 Design Agreement as an executory contract and stated "[t]he mechanism for the assumption or non-assumption of executory contracts is set forth in more detail in the Sale Motion," despite the fact that neither the G4 Design Agreement nor the Licensing Agreement was ever identified as an executory contract "that may potentially be assumed and assigned to the ultimate purchaser of the assets" as contemplated in the Sale Motion.  When the court reviewed the Chen Sale Agreement in conjunction with its entry of the Chen Sale Order, the court remained unaware that the Debtor had never included the G4 Design Agreement or Licensing Agreement on the Executory Contract Schedule.  The Debtor did not otherwise seek court approval under 11 U.S.C. § 365 to assume or assign the G4 Design Agreement or Licensing Agreement prior to executing the Chen Sale Agreement.

---

[7] "A proposed order shall be submitted contemporaneously with the filing of any document requesting relief in accordance with the procedures established in the Administrative Guide." E.D.N.C. LBR 9072-1.

[8] Exhibits A and C to the Agreement listed the Debtor's tangible and intangible personal property assets, respectively, to be transferred pursuant to the Chen Sale Agreement.  Both Exhibits A and C stated that the G4 Design Agreement was attached as Exhibit A-2.  There was no Exhibit A-2 attached to the copy of the Chen Sale Agreement filed as an exhibit to the Chen Sale Order.

27.    The Chen Sale Order directed Holland "to turnover immediately any of the G4 Property [as defined within the Chen Sale Order] in its possession or control to [Mr.] Chen," "[n]otwithstanding anything to the contrary . . . in the [Licensing Agreement]."

28.    The Chen Sale Order found that Mr. Chen was "a good faith purchaser . . . within the meaning of Section 363(m) . . . ."  It waived the stay imposed by Rule 6004(h) and authorized the parties to close promptly the sale of assets to Mr. Chen.  Pursuant to the terms of the Chen Sale Agreement, the sale of assets to Mr. Chen was scheduled to close on May 15, 2016 (five days following the court's entry of the Chen Sale Order).  The parties stipulate that the sale to Mr. Chen closed May 18, 2016 when funds were delivered to the Debtor in full; however, no physical assets have changed hands, and the Debtor has not produced a closing statement or bill of sale to the court.

29.    The Holland Companies filed the Motion to Reconsider on May 23, 2016.  The Motion to Reconsider seeks relief from the Chen Sale Order under Rules 59(e) and 60(b) of the Federal Rules of Civil Procedure, made applicable to this proceeding by Rules 9023 and 9024 of the Federal Rules of Bankruptcy Procedure, respectively.  The Motion to Reconsider asserts that the court should reconsider the sale of assets to Mr. Chen in light of evidence that was not made available to the court at the hearing on the Sale Motion and to prevent manifest injustice.  The court did not previously know about the existence of the Settlement Agreement, and the Holland Companies believed any assets related to the G4 product line would be excluded from the sale of the Debtor's other assets.  The Holland Companies argue the Debtor improperly sold the G4 assets without giving the Holland Companies the opportunity to offer a more attractive bid for those assets, and for these reasons the Chen Sale Order should be set aside under Rule 60(b).  The

Holland Companies request the court to require specific performance of the Debtor's assurance it would seek the court's approval of the Settlement Agreement.

30.    The Motion to Reconsider also questions whether Mr. Chen constitutes a good faith purchaser.  The Holland Companies assert that on April 14, 2016, when the Holland Companies were under the impression that a motion to approve the Settlement Agreement had been filed with the court, Mr. Johnstone contacted Mr. Van Riemsdijk to indicate that GL Yachting[9] would be purchasing the majority of the Debtor's assets, except for those assets related to the G4 product line.  Mr. Johnstone allegedly encouraged Mr. Van Riemsdijk to meet Mr. Chen, a potential financial partner for the future development of the G4, so that Mr. Johnstone could act as a salesman for the G4 product line with Mr. Van Riemsdijk and Mr. Chen.  The Holland Parties question what relationship, if any, Mr. Chen has to Mr. Johnstone, and whether improper collusion occurred in the days preceding Mr. Chen's bid that would deem his purchase to have not been made in good faith.

31.    Immediately after filing the Motion to Reconsider, the Holland Companies filed a Notice of Appeal of the Chen Sale Order on May 23, 2016;[10] however, the Notice of Appeal will not become effective until entry of this Order pursuant to Rule 8002(b)(2) of the Federal Rules of Bankruptcy Procedure.

32.    In the Response the Debtor and Committee assert that 11 U.S.C. § 363(m) statutorily moots any attack on the Chen Sale Order because the Holland Companies failed to obtain a stay of the Chen Sale Order before the sale to Mr. Chen closed.  The Debtor and

---

[9] According to the Motion to Reconsider, Mr. Johnstone actually stated that Outremer, an affiliate of GL Yachting, would be the highest bidder for the majority of the Debtor's assets.

[10] The Notice of Appeal filed by the Holland Companies on May 23, 2016 stated that the Holland Companies were appealing the court's order allowing the sale of assets unrelated to the G4 product line.  The Holland Companies filed an Amended Notice of Appeal appealing the Chen Sale Order on May 27, 2016.

Committee also assert that reconsideration of the sale of the assets to Mr. Chen is futile because the Holland Companies have not indicated they have the ability to outbid Mr. Chen.

33.     At the hearing on the Motion to Reconsider, Mr. Smith testified regarding the sale of assets related to the G4 product line.  Mr. Smith stated that on March 18, 2016, he became aware that Mr. Chen was interested in buying all of the Debtor's assets, or at a minimum the Debtor's interest in the G4 assets.  Mr. Smith also noted that Mr. Johnstone initially expressed interest in purchasing all or a portion of the Debtor's assets, but never placed a bid.  On March 25, 2016 and at Mr. Chen's request, Mr. Smith asked Mr. Van Riemsdijk if he would be open to partnering with someone "interested" in the G4 assets to continue production of the G4, and Mr. Van Riemsdijk informed Mr. Smith that he was not interested in forming a partnership with anyone unfamiliar to the Holland Companies.  Mr. Smith never explicitly informed Mr. Van Riemsdijk that there was a potential bidder attempting to purchase the Debtor's interest in the G4 assets or asked Mr. Van Riemsdijk to "outbid" Mr. Chen.  Mr. Smith stated at the hearing that he, Ms. Biggs and Mr. Darer "had a conversation about me going to Holland Composites [and asking the Holland Companies to increase the amount to be paid under the Settlement Agreement and] I think the Debtor's counsel and Unsecured Creditors' Committee counsel thought that I had done that and [the Holland Companies] had come back and said . . . that they . . . would not be able to increase their bid.  I did not reach out to Holland Composites at that bid deadline and ask if [the Holland Companies] would be willing to increase the bid."  Mr. Smith explained that based on his knowledge of the negotiations related to the Settlement Agreement, he believed the Holland Companies would be "either unable to or unwilling to" pay more than the royalty stream amounts contemplated by the Settlement Agreement; however, Mr. Smith never made that specific inquiry, and that failure is a monumental mistake.

34.     Ms. Biggs stated at the hearing that the purchase funds paid by Mr. Chen had not yet been disbursed to the Debtor or its creditors.  No tooling has been transferred from Holland to Mr. Chen.  Ms. Biggs was unsure whether any intellectual property had been transferred from the Debtor to Mr. Chen as of the date of the hearing.

35.     At the hearing, Mr. Van Riemsdijk testified about a new boat Holland is currently producing called the F4.  The F4 is six feet longer than the G4 but, like the G4, is also a racing catamaran.  Mr. Van Riemsdijk testified that the F4 is built from entirely separate tooling than the G4 tooling, except that the deck hatch mold from the G4 is used to build the F4 deck hatch.  Mr. Van Riemsdijk predicts that the F4, once available for purchase, will retail at approximately twice the cost of a G4.  Mr. Darer, counsel for the Committee, asserted that despite the size and price difference between the G4 and F4, the F4 will draw customers away from the G4, and Holland now appears less likely to provide royalties to the Debtor than when the Debtor and Holland Companies negotiated the Settlement Agreement.  The Committee offered no creditable support for these conclusions.  The Committee argued that forcing the Debtor to seek approval of an agreement that is allegedly no longer beneficial to the estate is a waste of resources because the Committee will object to any motion seeking approval of the Settlement Agreement.

## JURISDICTION

1.     The court's jurisdiction to hear a motion brought under Rule 60(b) is derived from the matter underlying the motion. *In re Kim*, 384 B.R. 188, 189 (Bankr. N.D. Ohio 2007).  The consideration of a sale of property of the estate is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(N), and the court has jurisdiction pursuant to 28 U.S.C. §§ 151, 157, and 1334.

2.      The court has the authority to hear this matter pursuant to the General Order of Reference entered August 3, 1984 by the United States District Court for the Eastern District of North Carolina.

3.      The Holland Companies' Notice of Appeal of the Chen Sale Order did not divest this court of jurisdiction over the Motion to Reconsider, as the Notice of Appeal will not become effective until entry of this Order.[11]

DISCUSSION

1.      As a threshold issue, the court will first address whether 11 U.S.C. § 363(m) statutorily moots the Motion to Reconsider as the Debtor and Committee suggest.  Section 363(m) states the following:

> [t]he reversal or modification *on appeal* of an authorization . . . of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m) (emphasis added).  In other words, "[a]s long as the purchase was made in good faith, the only way to disturb the validity of the sale is to obtain a stay pending appeal." *Pidcock v. Goddard (In re SII Liquidation Co.)*, 2014 Bankr. LEXIS 4436, at *40 (Bankr. N.D. Ohio Oct. 17, 2014).

2.      The Fourth Circuit Court of Appeals ("Fourth Circuit") has held in an unpublished opinion that § 363(m) is inapplicable when a sale order is attacked collaterally rather than on appeal. *In re Alan Gable Oil Dev. Co.*, 1992 U.S. App. LEXIS 29833, at *10 (4th Cir. 1992)

---

[11] *See* Fed. R. Bankr. P. 8002(b)(2).  The procedure of this case is distinguishable to that of *In re Winstead*, 33 B.R. 408 (M.D.N.C. 1983), in which *after* filing notice of appeal of the bankruptcy court's order, the aggrieved party moved for a rehearing before the bankruptcy court while the appeal remained pending.  In that case, the United States District Court for the Middle District of North Carolina found the bankruptcy court lacked jurisdiction to rehear the matter.

("[W]here an order authorizing a sale is challenged collaterally by motion under Fed. R. Civ. P. 60(b), section 363(m) on its face does not divest the bankruptcy court of the power to upset the sale under proper circumstances."); *see also In re Edwards*, 962 F.2d 641, 645 (7th Cir. 1992) (speculating that § 363(m) "does not of its own force preclude collateral attack on such sales"); *but see In re Sax*, 796 F.2d 994, 998 (7th Cir. 1986) ("[Section] 363(m) and the cases interpreting it have clearly held that a stay is necessary to challenge a bankruptcy sale authorized under § 363(b) [unless the challenger asserts lack of good faith]"; *In re Hagood Reserve, LLC*, 2010 Bankr. LEXIS 4486, at *42 (Bankr. W.D.N.C. Dec. 7, 2010) (opining that § "363(m) makes any effort to unwind [a] sale untenable" in the absence of a stay but nevertheless considering adverse party's Rule 60 motion).

3.      The court agrees with and follows the Fourth Circuit in *In re Alan Gable Oil Development Company* that § 363(m) does not apply to the relief sought by the Holland Companies under Rules 59 and 60 because § 363(m) specifically refers to the appeal of a sale order.  The court will nevertheless explain why, even if § 363(m) is applicable to collateral attacks on a sale order, it is not applicable under the circumstances of this case.

4.      The Holland Companies did not obtain a stay of the Chen Sale Order, and the parties in this matter stipulate that the sale of assets to Mr. Chen closed on May 18, 2016, prior to the Motion to Reconsider and appeal being filed.  At first glance, it may appear that the Holland Companies' "ship has sailed" and the opportunity to "undo" the sale to Mr. Chen has passed; however, § 363(m) only protects good faith purchasers from a sale being set aside.

5.      A good faith purchaser "purchases the assets for value, in good faith, and without notice of adverse claims." *Willemain v. Kivitz*, 764 F.2d 1019, 1023 (4th Cir. 1985).  At the hearing on the Sale Motion, Mr. Smith and Ms. Biggs did not provide much information about Mr. Chen,

16

and the court did not require a subsequent hearing to determine Mr. Chen's status as a good faith purchaser. The court recognizes now that it may have relied too heavily on the fact that Mr. Smith, as a third party sale facilitator, was responsible for qualifying potential purchasers of the Debtor's assets. Absent any assertions to the contrary at the hearing on the Sale Motion, and upon Ms. Biggs' assurance that Mr. Chen was the only "qualified" bidder for the G4 assets, the court found in the Chen Sale Order that Mr. Chen was a good faith purchaser.

6.      Mr. Van Riemsdijk's testimony about information that was not available to the court[12] at the hearing on the Sale Motion calls into question whether Mr. Chen is a good faith purchaser. The Fourth Circuit has recognized three grounds on which a court may grant a motion brought under Rule 59(e) to alter or amend a judgment: "(1) to accommodate an intervening change in controlling law; (2) to account for new evidence not available at trial; or (3) to correct a clear error of law or prevent manifest injustice." *Pacific Ins. Co. v. Am. Nat'l Fire Ins. Co.*, 148 F.3d 396, 403 (4th Cir. 1998).

7.      With the newly available evidence from the Motion to Reconsider in mind, the court must reassess Mr. Chen against the elements of a good faith purchaser.

a.      Value. The Holland Companies did not challenge the price Mr. Chen paid for the Debtor's interest in the G4 product line; however, the court is troubled by the fact that the Chen Sale Agreement makes no mention of the Licensing Agreement and does not address any cure that might be required under the Licensing Agreement. The Debtor apparently treated the Licensing Agreement as terminated upon receipt of the Termination Notice, but under the Licensing Agreement's terms the termination is not effective until

---

[12] The court distinguishes the facts before it from situations in which a party that was present at the hearing on a sale motion fails to challenge a prospective purchaser's good faith. *See, e.g. Hazelbaker v. Hope Gas, Inc. (In re Rare Earth Minerals)*, 445 F.3d 359, 365 (4th Cir. 2006). In this case, the Holland Companies had no reason to believe their presence at the hearing on the Sale Motion was necessary.

October 2, 2016, and the Licensing Agreement remains valid.[13]  Holland asserts a claim against the Debtor under the terms of the Licensing Agreement – a claim which the Settlement Agreement was meant to resolve.  The court was not made aware of the terms of the Licensing Agreement when the proposed sale to Mr. Chen was presented to the court. Upon examination of the Licensing Agreement and its terms, and in light of the fact that the Chen Sale Agreement fails to account for the Licensing Agreement in any manner whatsoever, the court is now unsure of the actual value of Mr. Chen's purchase price to the estate.  At the hearing on the Motion to Reconsider, Mr. Smith compared the unsecured royalty schedule in the proposed Settlement Agreement with Mr. Chen's $108,000.00 bid and asserted Mr. Chen offered the highest and most certain value to the estate.  Those terms, however, do not appear comparable.  Mr. Chen presumably did not take the Debtor's interest in the G4 assets (whatever interest that may be) subject to Holland's claim, because the sale was to be free and clear of liens, and Mr. Chen did not assume the Licensing Agreement.  If Mr. Chen did not take the assets subject to any cure amount, does the Debtor remain responsible under the Licensing Agreement for any monies owed to Holland?[14]

---

[13] At the hearing, the court brought up the question of whether a party could unilaterally terminate a contract with a debtor without violating the automatic stay of 11 U.S.C. § 362.  That question is not before the court, and may not be relevant because the termination is not yet effective.  Even if the Termination Notice triggered immediate termination of the Licensing Agreement, the court finds it was ineffective because it named a condition precedent (the Settlement Agreement being presented to the court and the court disapproving it) that never occurred.  The Committee raised the question at the hearing whether Holland has breached the Licensing Agreement by using deck hatch molds for the G4 to produce the F4 deck hatches.  Section 6.6 of the Licensing Agreement prohibits Holland from using the G4 tooling to produce boats or parts other than those used to build the G4.  The provisions of Section 9 govern early termination of the Licensing Agreement in the event of default.  It appears from the terms of the Licensing Agreement that breach (by using tooling to produce F4 parts) would give the Debtor the right to terminate the Licensing Agreement if the breach is not rectified within 30 days of receiving written notice thereof.  As a breach of the Licensing Agreement does not result in automatic termination, and no evidence having been presented that the Debtor gave written notice to Holland of the alleged breach, the Licensing Agreement appears to remain in effect.

[14] The Debtor has apparently not rejected the Licensing Agreement, so the provisions of § 502(g) do not appear applicable to determine what amount might be owed to Holland.  In the Response, the Debtor and Committee assert that because the Holland Companies never filed proofs of claim, "the only economic benefit to the estate" under the Settlement Agreement was the cash that the Holland Companies would pay.  It seems the Debtor believes that because it technically has not rejected the Licensing Agreement, any claim asserted by Holland is either barred by the

The court's inability to ascertain the overall value to the Debtor's estate of Mr. Chen's purchase price is sufficient reason to set aside the court's prior finding that Mr. Chen purchased the assets for value under § 363(m).

        b.     <u>Good Faith and Without Notice of Adverse Claims</u>.  The court will address these two elements together.  The court has no concrete evidence that Mr. Chen was aware of the existence of the Settlement Agreement when he executed the Chen Sale Agreement; however, Mr. Van Riemsdijk's testimony regarding the phone call from Mr. Johnstone gauging the Holland Companies' interest in partnering with Mr. Chen causes the court to wonder whether Mr. Chen had knowledge of the Holland Companies' assertion of rights over the G4 assets.  The apparent connection between Mr. Chen and Mr. Johnstone, who participated in initial settlement negotiations with the Holland Companies, could conceivably have fostered collusion between Mr. Chen and Mr. Johnstone in exploring the purchase of the G4 assets.  This type of involvement may affect a finding of good faith. *See, e.g. Willemain*, 764 F.2d at 1023 (quoting *In re Rock Industries Machinery Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978) ("Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, *collusion between the purchaser and other bidders or the trustee*, or an attempt to take grossly unfair advantage of other bidders.")) (emphasis added).  If Mr. Chen had knowledge of the Settlement Agreement when he placed his bid, the Holland Companies' interests in the assets subject to the G4 Design Agreement and Licensing Agreement could be construed as adverse claims to those assets.  The court recognizes that its theories of Mr. Chen's knowledge are speculative.  Mr. Chen may or may not have acted in bad faith when he bid on the Debtor's

---

claims deadline or somehow extinguished through the sale to Mr. Chen.  This outcome would be nonsensical and apparently relies on the incorrect assumption that the Licensing Agreement has been terminated by Holland.

interest in the G4 assets; however, the Holland Companies have presented sufficient evidence to warrant the court amending, pursuant to Rule 59(e), its finding that Mr. Chen was a good faith purchaser for value and without notice of adverse claims.

8.       In light of the evidence presented by the Holland Companies at the hearing on the Motion to Reconsider, and upon reconsideration of the proposed sale to Mr. Chen, the court hereby retracts its finding in the Chen Sale Order that Mr. Chen is a good faith purchaser.  As § 363(m) only protects good faith purchasers from reversal of a sale order, it does not protect Mr. Chen in this case, and the Chen Sale Order can be set aside without running afoul of § 363(m),[15] so long as the Holland Companies establish that relief is warranted under Rule 60(b). *See Wortley v. Chrispus Venture Capital, LLC (In re Global Energies, LLC)*, 763 F.3d 1341, 1350 (11th Cir. 2014) (contemplating that a bankruptcy court can "revisit" a sale under § 363, reverse its finding of good faith and void the sale).

9.       Rule 60(b) states as follows:

On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons:
(1) mistake, inadvertence, surprise, or excusable neglect;
(2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);
(3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;
(4) the judgment is void;
(5) the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or
(6) any other reason that justifies relief.

---

[15] As already noted, the court does not believe § 363(m) applies to collateral attacks on a sale order, but even if § 363(m) does apply to a Rule 60(b) motion, the court finds it is inapplicable in this case.  Some courts have also held that "§ 363(m) mootness is not applicable when [a party] seeks to attack the § 363 sale of estate property on the grounds of improper notice" because "§ 363(m) requires that the sale be authorized 'under subsection (b)' [and § 363](b) specifically requires a 'notice and hearing.'" *In re Moberg Trucking, Inc.*, 112 B.R. 362, 363 (B.A.P. 9th Cir. 1990) (quoting 11 U.S.C. § 363(b), (m)).  As discussed *infra*, the Holland Companies were not given adequate notice of the fact that the G4 related assets would be sold; however, the court declines to find that § 363(m) is inapplicable based on improper notice, relying instead on its legal conclusions discussed *supra*.

Fed. R. Civ. P. 60(b).  If a party is able to show cause under Rule 60(b), a court may set aside an order allowing the sale of a debtor's assets.

10.    "A bankruptcy court may vacate a prior order confirming a sale, however, only in very limited circumstances in the exercise of its powers as a court of equity." *In re Chung King, Inc.*, 753 F.2d 547, 549 (7th Cir. 1985) (citing *In re Beck Industries, Inc.*, 605 F.2d 624, 634 (2d Cir. 1979); *Mason v. Ashback*, 383 F.2d 779, 780 (10th Cir. 1967)).  The limited circumstances under which courts have set aside sale orders typically involve transactions "tinged with fraud, error or similar defects which would in equity affect the validity of any private transaction." *In re General Insecticide Co.*, 403 F.2d at 631 (quoting 4A *Collier on Bankruptcy*, P70.98[16] (14th ed. 1967)).  In such cases, "compelling equities outweigh the interests in finality." *In re CADA Invest., Inc.*, 664 F.2d 1158, 1162 (9th Cir. 1981).

11.    "In order to obtain relief from a judgment under Rule 60(b), a moving party must show that his motion is timely, that he has a meritorious defense to the action, and that the opposing party would not be unfairly prejudiced by having the judgment set aside." *Nat'l Credit Union Admin. Bd. v. Gray*, 1 F.3d 262, 264 (4th Cir. 1993) (quoting *Park Corp. v. Lexington Ins. Co.*, 812 F.2d 894, 896 (4th Cir. 1987)).  If a party can pass this threshold requirement, it then must satisfy one of the six grounds for relief contained in Rule 60(b). *Id.* at 266.

a.    The Motion to Reconsider Is Timely.  Rule 60(c)(1) requires that "a motion under Rule 60(b) must be made within a reasonable time." Fed. R. Civ. P. 60(c)(1).  The Motion to Reconsider was filed less than two weeks after the court entered the Chen Sale Order.  The Debtor insists the Holland Companies would have needed to file the Motion to Reconsider before the sale to Mr. Chen closed in order to warrant relief.  At the hearing, the Debtor focused on the fact that Mr. Van Riemsdijk never replied to Mr. Smith's May

4, 2016 email notifying the Holland Companies of the sale to Mr. Chen, implying Mr. Van Riemsdijk's failure to respond was unreasonable and should preclude him from challenging the sale through the Motion to Reconsider.  Mr. Van Riemsdijk testified that he was so shocked by Mr. Smith's email that he did not know how to respond or whom to contact. That reaction is reasonable given the prior representations and assurances by Mr. Smith and Ms. Biggs. The Holland Companies engaged counsel and filed the Motion to Reconsider within 19 days of receiving the email from Mr. Smith.  The court finds that the Motion to Reconsider was filed within a reasonable amount of time.

b.  <u>The Holland Companies Have a Meritorious Defense to the Action</u>.  As discussed *supra*, the Holland Companies have successfully questioned the good faith of Mr. Chen.  The Holland Companies could further argue that § 363(e) provides them with the right to challenge the sale of the G4 assets to a third party, or at a minimum, request judicial determination of the rights of the Debtor and the Holland Companies under the G4 Design Agreement and the Licensing Agreement before any G4 assets are sold to a third party.  Similarly, the Holland Companies may have a meritorious argument that as long as the G4 Design Agreement and Licensing Agreement remain valid, certain intellectual property and possibly the tooling remain co-owned assets and any sale of the G4 assets would require a sale pursuant to § 363(h).  Sufficient potential defenses to the sale of the G4 assets exist to satisfy this prerequisite for the court to entertain a motion under Rule 60(b).

c.  <u>Mr. Chen Will Not Be Unfairly Prejudiced if the Chen Sale Order is Set Aside</u>.  The court recognizes that the parties stipulate that the sale to Mr. Chen has closed, but that stipulation is inconclusive.  The funds paid by Mr. Chen remain in the Debtor's

22

trust account, and no physical assets have traded hands pursuant to the Chen Sale Agreement.  The court has seen no closing statement or bill of sale.  The sale has not been consummated, and while Mr. Chen may be displeased with these events, he will not be unfairly prejudiced.  In the words of Mr. Bircher, the Holland Companies' counsel, "this is not an egg that cannot be unscrambled."

12.    The Holland Companies have satisfied the threshold requirements of a Rule 60(b) motion. Turning to the grounds for relief from an order enumerated in Rule 60(b), the court finds that the Chen Sale Order should be set aside in light of the evidence the Holland Companies presented to the court.  Specifically, the notice regarding the sale of the G4 assets provided to the Holland Companies was inadequate under the circumstances and constitutes surprise under Rule 60(b)(1).  The assurance by Ms. Biggs that a motion for approval of the Settlement Agreement would be filed, while probably inadvertent, was a misrepresentation under Rule 60(b)(3).  The sale should also be set aside on the grounds that the Chen Sale Agreement and Chen Sale Order failed to resolve clearly the parties' ongoing rights and liabilities regarding the G4 assets, the G4 Design Agreement and the Licensing Agreement.

13.    <u>Inadequate Notice of the Sale and Misrepresentation of the Settlement Agreement</u>.

a.    "Due process requires notice that is reasonably calculated, under the circumstances, to apprise an interested party of the pendency of an action." *WBQ Ptnr. v. Virginia Dep't of Medical Assistance Servs. (In re WBQ Ptnr.)*, 189 B.R. 97, 103 (Bankr. E.D. Va. 1995) (quoting *Snug Enter., Inc. v. Sage (In re Snug Enter., Inc.)*, 169 Bankr. 31, 33 (Bankr. E.D. Va. 1994) (citing *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314-15 (1950)).

b.      Although the Holland Companies received notice of the Sale Motion and the Sale Procedure Order, they were led to believe that the G4 assets would not be sold pursuant to the Sale Procedure Order.  Ms. Biggs explicitly told Mr. Van Riemsdijk that the Debtor would be seeking court approval of the Settlement Agreement.  She led Mr. Van Riemsdijk to believe that the only way the G4 assets would be subject to a third party bid was in the event the motion to approve the Settlement Agreement prompted a bid for those assets ("the only likely reason the Bankruptcy Court would not approve the agreement is if someone else were willing to pay a higher price").  Mr. Van Riemsdijk had no reason to think the assets subject to the G4 Design Agreement and Licensing Agreement might be sold pursuant to the Sale Procedure Order.

c.      The notice and reliance circumstances of this case are similar to those described in *In re Winstead*, 33 B.R. 408 (M.D.N.C. 1983).  In that case, the trustee filed an application for court approval of the sale of estate property to Mr. Felts for $44,000.00, but at the hearing on the application sought approval to sell to Mr. Bishop for $45,000.00.  *Id.* at 409.  Mr. Felts received notice of the application but did not attend the hearing, and at the hearing the court approved the sale to Mr. Bishop.  *Id.*  The United States District Court for the Middle District of North Carolina found that, under the circumstances, notice of the sale was inadequate because it "was specific in its indication that a proposed sale of the property to Mr. Felts for $44,000 would be considered" at the hearing.  *Id.* at 410.  Mr. Felts in *Winstead* relied on notice that the proposed sale was to him and did not believe his presence at the sale hearing was necessary.  Similarly, Mr. Van Riemsdijk and the Holland Companies relied on Ms. Biggs' assertion that a motion to approve the Settlement Agreement would be filed and did not believe they needed to participate in any bidding

24

pursuant to the Sale Procedure Order.  When Mr. Chen submitted a bid for the Debtor's interest in the G4 assets, the Holland Companies were not given notice of that bid or the opportunity to counter Mr. Chen's bid.  This failure lies squarely with Finley. The Holland Companies were not given adequate notice that approval of the sale of the Debtor's interest in the G4 assets would be sought at the hearing on April 26, 2016.

d.      Further, the Executory Contract Schedule did not list the G4 Design Agreement or the Licensing Agreement as executory contracts that may potentially be assumed by purchasers of the Debtor's assets.  The Chen Sale Agreement lists the G4 Design Agreement as an executory contract being assumed by Mr. Chen.  PeeJeeDee did not have adequate notice that a third party might assume the Debtor's rights under the G4 Design Agreement.

14.     <u>Uncertainty of Assets Sold</u>.  Also weighing in favor of setting aside the Chen Sale Order is that the court is not even sure what Mr. Chen purchased pursuant to the Chen Sale Agreement.   The court questions whether 11 U.S.C. § 365 may require additional court consideration of the transaction and its effect on the G4 Design Agreement and Licensing Agreement.  As noted *supra*, the Chen Sale Agreement makes no reference to the Licensing Agreement, and no notice of the potential assumption of the G4 Design Agreement was given in the Executory Contract Schedule filed with the court.  Mr. Chen purchased, in the words of Mr. Smith, "Gunboat's interest in the G4 . . . the intellectual property and the rights, and Gunboat's rights are shared with the [Holland Companies] so Mr. Chen recognizes that he's not buying all of it, but he's buying Gunboat's interest in that."   Despite this representation, the Chen Sale Agreement makes no mention of the Licensing Agreement.

15.    Adequate notice was not afforded to the Holland parties.  The assets subject to sale were not clearly identified and executory contracts were not correctly assumed and assigned, and the sale process was compromised.  The Sale Procedure Order and the employment of Mr. Smith and Finley should have ensured fairness, order and transparency in the sale of the Debtor's assets, but that result was not achieved.  Instead, Mr. Smith and Ms. Biggs, as officers of the court, misled (hopefully unintentionally) the Holland Companies regarding the potential fate of the G4 assets.  The Debtor's assertion at the hearing on the Sale Motion that Mr. Chen was the only qualified bidder for the assets was misleading to the court.  The Chen Sale Order must be set aside.

16.    "In bankruptcy, the perception of a particular proceeding is often as important as the reality." *In re W.A. Mallory Co.*, 214 B.R. 834, 838 (Bankr. E.D. Va. 1997).  If the court were to allow the Chen Sale Order to stand, the court would be fostering the perception that an unsuspecting party may forfeit its rights at the proverbial eleventh-hour if a debtor finds a more attractive suitor.  The court is aware of the counter-argument Mr. Chen would surely raise in response: that his bid complied with the court's Sale Procedure Order and should be honored.  The court is sympathetic to Mr. Chen's predicament, but the failure of the Debtor and Finley to ensure transparency and fairness in the sale of the G4 assets demands revocation of the Chen Sale Order.

17.    The revocation of the Chen Sale Order is necessary even if the Holland Companies are unable subsequently to outbid Mr. Chen for the Debtor's interest in the G4 assets, and the Debtor again proposes Mr. Chen as purchaser.  Any subsequent sale of the assets must comply with § 365 and must clearly identify what interests the Debtor holds.  If Mr. Chen is ultimately the highest bidder for those interests, he will benefit in the end from actually knowing what he bought, and the court will fulfill its responsibilities for properly evaluating and sanctioning that sale.

18.    Regarding the Holland Companies' request that the court require specific performance in the form of a motion to approve the Settlement Agreement, the court finds that relief is neither reasonable nor feasible.  As counsel for the Committee noted at the hearing, if the Debtor were forced to file the Settlement Agreement for court approval, the Committee would object on the grounds that the terms of the Settlement Agreement are even less favorable now than they were in April, now that the Debtor is aware that Holland is developing the F4.  The court is still not convinced the G4 and the F4 are even remotely similar, except for a similar deck hatch, and summarily rejects the Committee's assertion.  The Chen Sale Order shall be set aside, and the Debtor and Finley, its "broker/sale facilitator" remain responsible for determining what assets are available for sale and how best to sell them; now therefore,

It is ORDERED, ADJUDGED and DECREED that the Chen Sale Order be, and hereby is set aside.

END OF DOCUMENT